SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

---

THE PEOPLE OF THE STATE OF NEW YORK,    440 Hearing

DECISION & ORDER

-against-

Ind. # 4344/2007

JOSEPH MELDISH

KIMBERLY HANZLIK,

Defendants.

---

APRIL A. NEWBAUER, J.:

On November 5, 2018, this court granted a hearing on post-conviction motions brought by defendants Joseph Meldish[1] and Kimberly Hanzlik[2]. Pursuant to Criminal Procedure Law (CPL)

---

[1] Procedural History regarding defendant Meldish:
On February 16, 2011 in Bronx County, the defendant Meldish was convicted of murder in the second degree. On October 18, 2011, following Justice Webber's denial of defendant's CPL 330 motion to set aside the verdict, the defendant was sentenced to a term of imprisonment of twenty-five years to life.

[2] Procedural History regarding defendant Hanzlik:
On February 16, 2011 in Bronx County, the defendant Hanzlik was convicted of murder in the second degree. On March 28, 2011, after Justice Webber denied defendant's CPL 330 motion to set aside the verdict, she was sentenced to a term of imprisonment of twenty years to life. On May 15, 2012, the First Department unanimously affirmed her conviction (*People v. Hanzlik*, 95 A.D3d 601 (1st Dept 2012)). On August 20, 2012, the Court of Appeals denied leave to appeal the First Department's decision (*People v. Hanzlik*, 19 NY3d 997 (2012)). On July 14, 2013, the defendant filed her first CPL §440 motion to vacate the conviction on the grounds of ineffective assistance of counsel because her attorney fail to cross-examine the cooperating co-conspirator, David Thiong, about a prior inconsistent statement. On February 20, 2014, defendant's motion was denied as the court found there was nothing to suggest that the introduction of the statement or questioning of Thiong would have brought about a different result (*citing Harrington v. Richter*, 131 SCt 770 (2011)). On December 4, 2014, the defendant filed an appeal. On April 9, 2015, the First Department unanimously affirmed her conviction (127 AD3d 447 (1st Dept 2015)).

sections 440.10(1)(f) and 440.10(1)(h), the defendants moved to vacate their convictions of murder in the second degree based on alleged *Brady* violations by the Bronx District Attorney's office. Defendants alleged that the District Attorney's Office withheld *Brady* material in the form of concealing the extent of its involvement in reaching a plea agreement with cooperating witness David Thiong. The defendants had sought and obtained sealed plea minutes from Thiong's Westchester guilty plea on August 16, 2007 in which the Westchester DA's office represented to the court in Westchester as follows:

> Earlier this morning there was a meeting had in the courthouse between the defendant and representatives of the Bronx District Attorney's office as well as the New York, the New York Police Department. The understanding between all parties, which would include the Bronx District Attorney's Office, is as follows: This defendant is to give full and complete cooperation to the Bronx District Attorney's Office in an ongoing homicide investigation. This shall include but is not necessarily limited to his truthful, full, truthful and full testimony before the Bronx County Grand Jury in the near future. And of course if necessary trial testimony. If his cooperation is completed, we will be, we will, based on a representation of the Bronx District Attorney's Office that that was so, allow him to withdraw his previously entered plea to criminal possession of controlled substance in the fifth degree, have him withdraw that and just proceed to sentence on the possession seventh...(Minutes, Ex E, White

On March 28, 2016, Hanzlik moved a second time to vacate her conviction on the grounds of ineffective assistance of counsel or alternatively, to renew and reargue the denial of her prior motion to vacate her conviction and to dismiss the indictment on actual innocence grounds. The motion was denied. The defendant reargued the denial, claiming the court misapprehended the law. Relying on the recent First Department case of *People v. Jiminez*, 2016 NY Slip Op 05620, the court found that the court in denying the defendant's appeal and unanimously affirming her conviction, essentially foreclosed the defendant's claim of actual innocence. Thiong's interview with the detectives was referred to as a "half-consistent, half-inconsistent statement" that would 'not likely persuade a jury' and the complaining witness's identification testimony was corroboration 'placing the defendant at the scene', which would contradict Thiong's statement. The defendant's factual allegations lacked sufficient merit to warrant the exercise of the court's discretion to grant a hearing surrounding use of the Thiong statement as an actual innocence claim.

In a decision dated August 24, 2016, the court found the defendant failed to meet her burden of establishing by clear and convincing evidence that she was actually innocent of the crime of murder in the second degree . On October 14, 2016, the First Department denied the defendant permission to appeal. In a decision dated December 8, 2016, this court denied defendant's motion to reargue her September 19, 2016 motion, as defendant simply reiterated the issues argued in her prior motion. On August 29, 2017, defendant petitioned the United States District Court for the Southern District for a writ of *habeas corpus,* which is being held in abeyance pending resolution of the current motion.

affirmation.)

The assigned Assistant from the Bronx District Attorney's office denied the existence of a three-way deal: "My offer was wholly independent of any Westchester County offer on SCI 440S-2007". (Affirmation of Christine Scaccia, Ex.1 to People's opposition)

Upon review of the documentation submitted and considering the relevant statutes and case law presented in the moving papers, the court conducted a hearing.[3] The hearing was commenced on January 28, 2019 and concluded on February 11, 2019. The parties were given an opportunity to supplement the hearing with additional memoranda of law and each side filed additional papers. At the conclusion of the hearing and upon consideration of the testimony at the hearing as well as the trial transcript, court file and legal authority, the defendants' motions to vacate their convictions pursuant to CPL § 440.10(1)(f) and 440.10(1)(h) are denied.

The court reviewed the following submissions regarding the motion:

Defendant Meldish's notice of motion and affirmation of Brendan White, supporting documents and Memorandum of Law, filed April 30, 2018;

Defendant Hanzlik's notice of motion and affirmation of Irving Cohen, supporting documents and Memorandum of Law filed June 13, 2018;

People's Notice of Motion to Rescind Appointment of Special District Attorney filed June 21, 2018;

---

[3] The court granted a hearing to determine the factual issues involving defendant's motion including 1) the extent to which the Bronx District Attorney's office was involved in any offers to the cooperating witness in related proceedings; 2) precisely what was disclosed regarding any such offers to defense counsel, and in what form and when the disclosures were made; and 3) the extent to which any facts not disclosed or belatedly disclosed affected the ability of the defense to challenge the witness's credibility at trial.

People's Affirmations in Opposition to defendant Meldish's motion and
Memorandum of Law and Exhibits 1-5 filed August 21, 2018;

People's Affirmations in Opposition to defendant Hanzlik's motion and
Memorandum of Law and Exhibits 1-9 filed August 21, 2018;

Defendant Meldish's Reply Memorandum filed September 18, 2018;

Defendant Meldish's Post Hearing Memorandum of Law in support of motion to vacate
pursuant to CPL § 440.10 filed 3/1/2019

People's Post Hearing Submission filed 3/1/2019

Defendant Hanzlik's Post Hearing Memorandum of Law in support of motion to vacate
pursuant to CPL § 440.10 filed 3/4/2019

Complete trial transcript and court file

The defendants seek to vacate the judgment of conviction pursuant to CPL § 440.10 based on the hearing record and the unsealed plea minutes of Thiong from Westchester County on August 16, 2007. Defendant Meldish claims that in violation of *Brady v Maryland*, 373 US 83 (1963), the United States Constitution and New York State Constitution, the People failed to disclose the true nature of Thiong's cooperation agreement. Defendant Hanzlik concurred and added that the Bronx ADA was not candid about the agreement she had with David Thiong, and thus violated her *Brady* obligation, hindered defense counsel's cross examination and hampered the prior claim defendant raised of ineffective assistance of counsel.

In opposition, the People contend that they did not make any misrepresentations regarding Thiong's cooperation agreement. Moreover, the jury had ample information regarding Thiong's cooperation which the defense attorneys thoroughly used in cross examination and in arguing that Thiong was compromised by his cooperation. Finally, if there was any failure to disclose *Brady*, it

would not have changed the outcome of the case.

**The Witnesses**

During the hearing, counsel for defendant Hanzlik called Jonas Gelb, Esq. Gelb represented defendant Hanzlik during the hearing and trial in 1999. Gelb had a specific recollection that a witness at the trial, David Thiong, who was considered an accomplice[4] of the defendants in committing the murder, cooperated with the People and testified in the grand jury with immunity and at trial against Meldish and Hanzlik. Gelb recalled that he was made aware during his cross examination of Thiong, that Thiong had charges pending in Westchester county for sale and possession of a large quantity of drugs, with a potential maximum sentence of 25 years' incarceration. Thiong's sentence exposure was significant because of his criminal history, and the fact that Thiong was on parole at the time.[5] Yet he was offered a plea to a misdemeanor and a minimal sentence if he fulfilled his cooperation deal in the Bronx.

Gelb testified that the Bronx ADA informed both the trial judge and the defense counsel that she had no involvement in the disposition of the Westchester matter. Gelb asked and was told that Thiong's deal only involved immunity for the homicide and did not involve any sentence he would receive on the Westchester case. Gelb testified that in his cross examination of Thiong, he acted under the assumption that the Westchester District Attorney's office was free to do whatever it

---

[4] Thiong testified that he was the getaway driver for the defendants.

[5] The People introduced four pages of the trial transcript marked People's Exhibit #1 to refresh Mr. Gelb's recollection that Thiong believed that his deal included testimony in the grand jury and at trial and as part of the package deal in Westchester case he would receive a misdemeanor and time served (which was eleven months) and immunity on the homicide in the Bronx. On page 481 in the trial transcript, Thiong indicated that he met with ADA Scaccia and the only deal he received from the Bronx was immunity and he received a misdemeanor in Westchester county for testifying in the grand jury and at trial.

wanted with respect to the plea offer without input from the Bronx District Attorney's office. Gelb testified that it would have affected his actions at trial in cross examining Thiong if he knew that the cooperation agreement entailed the Westchester plea and sentence-- because he would have asked more questions "revealing that his result in Westchester County of such a lenient disposition was contingent upon his cooperation or testimony against the two defendants in the Bronx". Gelb believed that if Thiong had been asked more questions about the result of the Westchester case, it would have impaired Thiong's credibility as a motivated witness.[6] Gelb characterized the misdemeanor plea in Westchester County as a "sweetheart deal" considering the charges Thiong was facing, the fact that he was on lifetime parole and that he was a predicate felon.

Meldish's attorney then called Assistant District Attorney Christine Scaccia as his witness. Scaccia testified that she recalled Thiong being mentioned in a DD5 early in the homicide investigation before she became involved in the matter. Scaccia stated that at the time she became involved in the homicide investigation, Thiong was in custody facing drug-related charges in Westchester County, so she contacted Westchester County to set up time to meet with Thiong as he was a potential witness in her Bronx county case.[7] Scaccia also represented that she never takes notes and that she did not remember any content from this conversation except that it was to arrange the meeting. On May 3, 2007, Scaccia learned that Thiong was an alleged accomplice in the homicide as his role was the getaway driver. Eventually Scaccia met with him on August 16, 2007,

---

[6] The trial transcript (480 et seq.) reveals that Gelb extensively cross examined Thiong about his Westchester County plea to a misdemeanor, attempting to suggest that it was part of his deal of testifying for the People in the homicide.

[7] Scaccia explained that she needed permission from the Westchester County District Attorney's office as well as the defendant's attorney, Marilyn Reader, to pull Thiong out to speak with him. Westchester County District Attorney's office contacted Thiong's counsel and set up the meeting that took place on August 16, 2007.

a day where Thiong also had a court appearance scheduled in Westchester County Court. Scaccia, an NYPD detective, Thiong, Thiong's counsels Robin Bauer and Marilyn Reader, and ADA Moore, a member of the Westchester County District Attorney's office were present for the meeting in the Westchester County courthouse. Thiong executed a "queen for a day" proffer and informed the parties about his role in the homicide as well as the defendants' involvement.

Scaccia indicated that there was no agreement that Thiong would receive a benefit in the Westchester county case in exchange for his cooperation in the Bronx. Scaccia testified that the only agreement between Thiong and the Bronx District Attorney's office was that Thiong would receive immunity for his role in the homicide investigation, and in exchange he would testify in the grand jury and if necessary at trial. Scaccia was not present in the court when Thiong took his plea in Westchester and she stated that she did not follow up with respect to the outcome of the Westchester case or the parole violation. After the meeting, Scaccia and her detective left. Thiong's case appeared on the calendar in Westchester later that day. The plea minutes were sealed by the court after Thiong took his plea.

Scaccia insisted that she did not ask Westchester County to reduce the charges Thiong was facing in Westchester in return for his cooperation in the Bronx. Scaccia testified that during the proffer with Thiong she did not discuss any offer or deal in the Westchester case; that there was no mention of the charges pending in Westchester during the proffer, and that she did not discuss with Thiong receiving any benefit as to parole.[8] Essentially she maintained that whatever Westchester chose to do was 'Westchester's deal'. Prior to calling Thiong as a witness at trial, Scaccia learned

---

[8] The only contact ADA Scaccia indicated that she had with parole was to inform parole that Thiong was going to cooperate by testify at trial as is required when any parolee testifies at trial.

that he did receive a time served sentence and was violated on parole. Scaccia testified that as a matter of professional courtesy, ADA Moore from Westchester asked her if she had any opposition to offering Thiong a plea in the narcotics case. Scaccia said she told ADA Moore to do whatever he wanted to do because the Bronx case was unrelated to the Westchester case.[9] In addition, Scaccia testified she never obtained the minutes from Thiong's plea.

Counsel for defendant Meldish also called as a witness in the hearing Murray Richman, Esq., Hanzlik's trial attorney. Richman learned some time leading up to the trial that the People were going to call David Thiong as a cooperating witness. During the course of the trial, Richman testified that he requested *Brady* from ADA Scaccia including any and all deals that Thiong made with the ADA. He said Scaccia advised him that she went to see Thiong in Westchester County but there was no deal on the Westchester case. Richman recalled cross examining Thiong regarding any deals Thiong had with the ADA for his testimony. After Thiong's testimony, he stated, there was a sidebar before the court regarding any arrangements made between Bronx county and Thiong. Again, Scaccia represented that she did not make a deal involving the Westchester case and had nothing to do with the plea there. Richman testified that he had not seen a transcript of the plea. Richman indicated that the minutes of this plea would have been important to cross examine Thiong to impeach his credibility.[10]

After the defendants rested, the People called ADA Moore as their witness. Moore has been

---

[9] ADA Scaccia stated that she offered immunity because Thiong was the getaway driver and never entered the location where the homicide took place. The information Thiong proffered was consistent with what ADA Scaccia already knew about the case.

[10] As shown in the trial transcript at pages 447, 449-51, 453, 445-458, 471-474, Mr. Richman extensively cross examined Thiong about his Westchester County plea to a misdemeanor as part of his deal to testify for the People in the homicide, and how incompatible the Westchester sentence was considering his criminal record, his predicate status and the pending felony charges.

in the Westchester DA's office for 32 years and is currently the Chief of the Gang Violence and Gun Bureau. Moore testified that he along with an investigator from his office, two attorneys for Thiong, ADA Scaccia and an NYPD Detective were present for Thiong's proffer session. ADA Moore recalled the Westchester case was not discussed during the proffer; only immunity in the Bronx case was discussed. On March 3, 2007, he first became aware of the Bronx interest in Thiong. Moore testified that in April of 2007, the Chief of Narcotics (Tom Luzio) made an offer before he was in contact with ADA Scaccia to allow Thiong to plead to criminal possession of controlled substance in the fifth and seventh degrees with the hope that the defendant would withdraw his plea on the felony and be sentenced on the misdemeanor. A favorable offer was made because of 'issues' in the case. ADA Moore testified that it was not usual at that time to offer a misdemeanor to defendants who were charged with possession with intent to sell, but was not aware of anyone from the Bronx seeking favor on the Westchester case for Thiong's cooperation or testimony. Moore was confronted on cross examination by notations made by ADA Kevin Kennedy on May 8, 2007, "CI to provide info regarding homicide in exchange for reduced plea on Westchester narcotics case." ADA Kennedy was not present for the proffer on August 16, 2007 and only appeared in court for the plea.

**Legal Analysis**

In order to set aside a verdict based upon newly discovered evidence, the defendant must establish that there was evidence which was discovered since the trial, and could not have been discovered prior to trial, is not cumulative and does not merely impeach or contradict the record but would probably change the result if a new trial is granted. *People v Wainwright*, 285 AD2d 358, 360 (1st Dept 2001), *citing People v Salemi*, 309 NY 208, 219 (1955).

The duty of a prosecutor to disclose exculpatory material includes the disclosure of evidence

impeaching the credibility of a prosecutor's witness, whose testimony may be determinative of innocence or guilty. *See People v Baxley*, 84 NY2d 208 (1994). To establish a *Brady* violation in this context, a defendant must show that the evidence not disclosed was favorable as either exculpatory or impeaching in nature, the evidence was suppressed by the prosecution, and prejudice arose because the suppressed evidence was material, in that there exists a reasonable possibility that it would have changed the result of the proceedings. The First Department in the case of the *People v Sibadan*, 240 AD2d 30, 34 (1st Dept 1998), held that a prosecutor's duty to disclose *Brady* material applies to evidence affecting credibility of government witnesses, including evidence of any agreement or promise of leniency given to a witness in exchange for favorable testimony against an accused. The disclosure obligation arises only where the prosecutor and the witness have reached an understanding in which the witness' cooperation has been exchanged for some *quid pro quo* on the part of the prosecutor (*People v Novoa*, 70 NY2d 490, 497 (1987)), or where there is any other indication that the witness's cooperation was bargained for, directly or indirectly. *See People v Piazza*, 48 NY2d 151, 163 (1979).

Two recent appellate opinions address these issues and reach different conclusions. *See People v. Lalonde*, 160 AD3d 1020 (3d Dept 2018); *People v. Giuca*, 158 AD3d 642 (2d Dept 2018), *lv. to appeal granted* 31 NY3d 1117 (June 28, 2018). In *People v. Lalonde,* 160 AD3d at1028, the court rejected the defendant's CPL§440 claim without a hearing because the defendant was aware of the witness's cooperation agreement and was free to cross examine the witness about it. The court emphasized that even if the prosecutor did not disclose the full extent of a three way agreement and that constituted a *Brady* violation, the witness's testimony did not go "wholly unimpeached". The strength of the prosecution's case also factored into the court's decision.

In *People v. Giuca,* 158 AD3d 642, in contrast, the Second Department vacated the

defendants's conviction, finding that factual information which could be construed as a promise was *Brady* material, notwithstanding how the promise was formed or labeled. While the evidence in that CPL§440 hearing did not demonstrate an express promise between the witness and the District Attorney's office, it left a strong inference of the expectation of a benefit, and the court determined that information should have been put before the jury. The conviction was vacated due to the prosecutor's failure to convey the tacit understanding between the prosecutor and the witness that he would receive leniency despite his poor performance in a drug program because he agreed to testify against the defendant at trial.

This case presents a different permutation of similar facts, with the added wrinkle of more than one District Attorney's office being involved. Assistants from the two District Attorney's offices met after a telephone conversation to arrange a meeting. The defendant was facing significant charges in Westchester. The meeting was arranged to include the Westchester DA's office; it was not just between the Bronx DA and the witness. The Westchester ADA had the opportunity to be present for the "queen for a day" disclosures. With the Westchester DA present, the Bronx DA agreed to give the witness immunity for a homicide in exchange for his testimony in the grand jury and at trial. The defendant did not immediately agree. The Bronx ADA and NYPD detective left. The Westchester DA was left with the witness and his attorneys. A favorable plea ensued, which the Westchester DA justified to the court as an accommodation to a Bronx cooperating witness. The witness cooperated with the Bronx DA.

When arranged in this way, the facts here suggest a potential violation of *Brady* akin to what was present in *People v. Giuca*, 158 AD3d 642. However also conceivable that the two offices had separate agendas, or that the Westchester DA just chose to accommodate Bronx without it being a deal. Any role played by Thiong's Westchester defense counsel is unknown. In addition, nearly all

-11-

of these facts were known to the defense counsel at the time of the defendants' trial. The only aspects of the situation which have now surfaced are the Westchester ADA's running notes and the August 16, 2007 transcript, which reveals the ADA's characterization of the plea to the Westchester judge. ADA Scaccia repeatedly affirmed that she was not present at the plea or sentencing of Thiong during the trial, in her affirmation and at the 440 hearing. She could not have known what the Westchester prosecutor actually said to the court. An ADA is not obligated to turn over minutes to which she does not (yet) have access. *See People v. Fishman*, 72 NY2d 884 (1988). Moreover, although Thiong's Westchester plea was discussed during the trial, neither defense counsel requested the plea minutes or objected to the absence of the minutes.[11]

Further, the defense had a full opportunity to cross examine the witness at trial and did so 'vigorously'. Both defense attorneys during their cross examinations asked Thiong if his understanding of his cooperation deal included a plea to a misdemeanor on his Westchester narcotics case and time served plus ninety days on his violation of parole. Thiong agreed that he received other benefits beyond immunity. Thiong may have believed based upon the timing of the plea and a conjoined meeting with both District Attorney's offices that his cooperation agreement included immunity as well as the Westchester plea as evidenced by his testimony during the trial. But both defense counsel amply cross examined Thiong's credibility based upon Thiong's

---

[11] Meldish's attorney Murray Richman had requested documents from August of 1999 of Thiong's Bronx prosecution in which Thiong went to trial and was convicted of two counts of A-2 narcotics felonies and one count of a B narcotics felony. (Trial transcript p. 388.) Later (p. 492) Richman claimed there was a *Brady* violation based on the Westchester case because the prosecution represented that the only deal the Bronx District Attorney's office made with Thiong was immunity for the Bronx homicide. Richman alleged that Thiong was also promised time served on the Westchester case (which was 11 months) for a misdemeanor plea and 90 days on his violation of parole to run consecutive. The People represented that was an offer made by Westchester after negotiations with Thiong's attorney and had nothing to do with her Bronx case. Although addressed on the record, neither counsel requested that the minutes of the plea of the Westchester case or the Putnam case in which Thiong was serving his sentence at the time of the trial.

understanding of the various parameters of the cooperation agreement. In their summations, both counsel attacked Thiong's credibility based upon his plea deal.[12] The jury was able to consider each of these issues in conjunction with Thiong's credibility and, nonetheless, found each of the defendants guilty. In this motion, the defendants failed to establish how further disclosure would have been material and not cumulative to impeachment. *See People v Richards*, 184 AD2d 222, 222-223 (1st Dept 1992), *lv denied* 80 NY2d 1029; *People v Sibadan*, 240 AD2d 30, 35 (1st Dept 1998). In addition, the defendants have not demonstrated that there is a reasonable possibility or probability that the outcome of the trial would have been different.

The defendants' real contention--that the Bronx DA intentionally concealed a three way agreement--was not borne out by the facts adduced at the hearing. The People informed defense counsels of Thiong's cooperation agreement prior to trial.[13] There was no showing that anyone in the Bronx DA's office asked Westchester county prosecutors to take any action with respect to the Westchester felony narcotics case or Thiong's violation of parole. ADA Moore was present as a moderator during the proffer session and both he and ADA Scaccia testified that the Westchester case was not discussed.

The Westchester District Attorney's file notes indicate that in April, 2007, the offer to Thiong was a plea to criminal possession of a controlled substance in the fifth and seventh degrees, and "no

---

[12] In the trial transcript at pages 1069 - 1071, Gelb attacked the Thiong's veracity by comparing his statements to the act of bartering: "Tell us that Joey and Kim did it" (p. 1069, l. 22) and ""you're going to get out of jail free card in exchange for your testimony here" (p. 1070, l. 19-20). Then Richman reinforced that Thiong is not to be believed as he has a motive to lie as an accomplice facing significant time but who gets out of jail only because he testifies for the People against the defendants under a cooperation agreement (p. 1091-1092, 1103).

[13] The court notes that prior to any interaction with Thiong and someone from the Bronx District Attorney's office, Thiong was already in custody for eight months. An Assistant in Westchester already noted that Westchester was inclined to reduce counts on the indictment prior to any interaction between Thiong and the Bronx District Attorney's office..

position" on sentencing. On May 3, 2007, there is a reference to a reduced sentence if Thiong successfully cooperated, presumably with the Bronx, although there is no explicit notation. On May 23, 2007 a lengthier set of notes indicates "speaking with Christine Scaccia", that Thiong is alleged to be the get away driver in the Bronx, and the same offer to be made ("(1)CPCSS 220.06/5 2 ½ + 2 PRS + (2) CPCS 7 220.03 option open re coop"). The August 16, 2007 court minutes reflect that on May 23, 2007, Thiong was offered a plea to a two count superior court information of criminal possession of a controlled substance in the fifth and seventh degrees. The Westchester DA's sentence position was two and one half years' incarceration with post release supervision on the felony count and would leave the possession seventh count open based upon cooperation.

ADA Scaccia apparently did not inform the defense counsel of the conversations and offers being made in Westchester, but the question is why. The Westchester DA's position was significantly different after the proffer meeting, but again, the question is why. It is not clear what precipitated the Westchester DA's positions. It was not incumbent on the Bronx Assistant District Attorney to explain how notes that could imply a three way deal were in the Westchester ADA's file unless of course she knew. The defendants did not call ADA Kennedy. Neither did the defendants call Thiong's attorneys as to the negotiations that ensued after ADA Scaccia left the Westchester courthouse. A hearing court is left to conjecture whether the Westchester DA's office acted independently because of issues in their case, or as a courtesy to the Bronx DA, or for other reasons. Not much light was shed on these questions at the 440 hearing.

There are some unsettling aspects of the Bronx ADA's conduct in this matter, including her attempt to insinuate during her summation that she indeed could have offered the defendant

something in his Westchester case in exchange for his testimony,[14] while simultaneously denying the existence of any influence over the Westchester outcome before the trial judge. The ADA was obliged to reformulate her statements to the jury after an objection. Second, while she might not remember the entire conversation or conversations, the fact that the ADA herself called the Assistant handling the Westchester case directly to arrange a meeting about getting cooperation in a two defendant homicide but cannot recall discussing anything except arranging the meeting is farfetched.

**Conclusion**

The court finds that the defendants did not show there was willful misconduct on the part of the People to conceal the truth. *See People v Williams*, 7 NY3d 15, 1920 (2006). The defendants failed to demonstrate a reasonable possibility that further disclosure of the parameters of Thiong's cooperation deal would have changed the verdict. *See People v Richards*, 184 AD2d at 222-223. Moreover, most of the documentary proof that defendants rely on in support of their motion and claim that the People failed to disclose the full extent of their cooperation agreement with Thiong does not constitute new evidence as contemplated by CPL § 440.10, since the majority of those facts were known to defendants at the time of trial.

Accordingly, although the defendants established that Thiong's plea minutes were discovered since the trial, standing alone they are cumulative and could merely be used to impeach or contradict the record but would not likely change the result if a new trial was granted. The defendant's motions pursuant to Criminal Procedure Law (CPL) sections 440.10(1)(f) and 440.10(1)(h) to vacate their convictions of murder in the second degree are denied.

---

[14] "If I had wanted to given him a deal for seven grams of crack I would have no problem telling you that."

This decision shall constitute the order of this court.

ENTER,

Dated: Bronx, New York
April 8, 2019

*(signature)*
Honorable April A. Newbauer