UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

KIMBERLY HANZLIK,

     Petitioner,

   v.

JOSEPH JOSEPH, Superintendent, Bedford
Hills Correctional Facility.,

     Respondent

------------------------------------------------------------- x

**ORDER DENYING HABEAS
PETITION**

17 Civ. 6577 (AKH)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED 2/12/2020

ALVIN K. HELLERSTEIN, U.S.D.J.:

    Petitioner Kimberly Hanzlik, currently incarcerated at the Bedford Hills

Correctional Facility in New York, was convicted in 2011 of second-degree murder, in violation

of N.Y. Penal Law § 125.25(1), and sentenced to an indeterminate term of twenty-years-to-life in

prison. Thereafter, Petitioner brought two rounds of challenges to her conviction under N.Y.

C.P.L. § 440.10, both of which were rejected by the New York state courts. Petitioner filed the

instant petition in 2017, seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After

this petition was fully briefed, the parties notified the Court of then-newly unsealed plea minutes

covering the 2007 guilty plea of one David Thiong—a central prosecution witness in Petitioner's

murder trial—to unrelated drug possession charges. Petitioner contended that the plea minutes

showed that Thiong's plea deal provided more incentive for him to testify against Petitioner than

was disclosed at her trial. I stayed the matter to enable Petitioner to pursue an additional state-

court challenge based on the minutes. *See* May 2018 Order, ECF No. 23. Petitioner's motion

premised on the minutes was denied in April 2019 by the Bronx County Supreme Court, and the

First Department denied Petitioner leave to appeal that July. The parties then filed supplemental

briefing to address this most recent round of state court decisions, and I lifted the stay. For the

reasons set forth herein, the petition is denied.

1

## Background

This petition concerns the murder of Joseph Brown, who was shot and killed while out with his wife at Frenchy's Bar in the Bronx ("Frenchy's). Petitioner and her alleged accomplice, then-boyfriend Joseph Meldish, were both convicted of the murder. The following background, presented to the extent relevant to the disposition of this matter, is taken from the records of Petitioner's trial and Petitioner's posttrial § 440 motions.

A. The Murder Investigation

Joseph Brown was shot and killed at around 2:00 a.m. on March 21, 1999 at Frenchy's by a male shooter wearing a mask that hid the shooter's face. The New York Police Department promptly began an investigation. The police interviewed several persons of interest, including Eileen Brown, the wife of the late Joseph Brown, and David Thiong, an acquaintance of both Meldish and Petitioner who had, on occasion, provided Meldish and Petitioner with drugs. In an interview conducted the night of the attack, Eileen Brown told the police that the deceased's brother, Thomas Brown, had recently had an altercation with someone by the name of "Meldish," but Ms. Brown did not at that time identify Petitioner as having been present at Frenchy's.

On April 14, 1999, Thiong was questioned by the police. Thiong denied having any information about the homicide, and told the police that, on the night of the murder, he had driven Meldish and Petitioner to the "Half Crowne Bar." On August 12, 1999, Thiong was questioned again by the police. Thiong again denied having any knowledge of the murder. On September 14, 1999, Thiong was questioned for a third time, and this time related a different story. Thiong told the police that on the night of the murder, Thiong had driven Meldish and Petitioner to the Half Crowne Bar; that, thereafter, Thiong and Meldish had driven Petitioner to her home; that Thiong and Meldish, without Petitioner, then drove back to Frenchy's, at which

2

time Meldish entered the bar, Thiong (still in his car) heard five gunshots from inside, and Meldish returned to Thiong's car with a gun in his hand. This third interview was memorialized in the handwritten notes of a detective present at the interview and in a typed "DD5" report. *See* State Record ("SR") 231 (Interview Notes); SR 34 (DD5 Report).[1] The parties agree that the handwritten notes were produced to Petitioner before trial.

The homicide was not actively prosecuted for several years. In or around 2006, Detective Kevin Tracy was assigned to Joseph Brown's cold case file. Detective Tracy reviewed the case file and re-interviewed a number of individuals, including Eileen Brown and Thiong. In August 2006, Detective Tracy met with Eileen Brown, at which time she recalled that, on the night of the murder, she had seen a woman in the restroom who "did not look like [she] fit in." In January 2007, Thiong was arrested on drug charges and for violation of his parole, and was imprisoned in Westchester County. Detective Tracy visited Thiong in jail and, during this meeting, Thiong changed his account of the events surrounding the murder. Thiong told Tracy in relevant part that on the night of the murder, Thiong had driven both Meldish and Petitioner to Frenchy's, and that Petitioner had participated in the murder by scouting Joseph Brown's whereabouts in the bar and relaying that information to Meldish.

On August 16, 2007, Thiong attended a meeting with officials from the Bronx District Attorney's ("DA's") office and Westchester DA's office, including Bronx Assistant District Attorney ("ADA") Christine Scaccia, the assistant who was to prosecute the case against Petitioner through trial. Thiong agreed to testify against Meldish and Petitioner before a grand jury and at trial, in exchange for immunity as to Joseph Brown's murder. Later on the same day (August 16), (a) Thiong pleaded to a lesser drug offense in Westchester County and (b) Thiong's

---

[1] References to "SR" correspond with the "State Record" submitted as an attachment to the government's answer, available at ECF Nos. 14-1 through 14-5.

3

pending parole violation was withdrawn. The parties dispute whether Thiong's reduced drug plea was the result of a three-way plea deal among the Bronx DA's office, the Westchester DA's office, and Thiong, or whether the Westchester DA's office acted itself, in its own discretion, to allow Thiong to plead to lesser charges. This claim is discussed in more detail, *infra*.

In November 2007, a Bronx County grand jury charged Petitioner with second-degree murder, in violation of N.Y. Penal Law §125.25(1).

B. The Trial

1. The Prosecution

The trial began on January 20, 2011, almost 12 years after the homicide. The prosecution theory was as follows. A few months before Joseph Brown was shot, Meldish and Thomas Brown—Joseph's brother—got into an argument regarding Thomas's refusal to lend Meldish money. Meldish, looking to exact revenge, planned to go to Frenchy's with the intent to shoot Thomas. Thiong drove Meldish and Petitioner to Frenchy's. Petitioner entered the bar, surveilled the clientele, and saw a man she believed to be Thomas Brown, but was in fact the brother, Joseph. Petitioner returned to Thiong's car, told Meldish where in the crowded bar he could find "Thomas," and then Meldish walked into the bar and shot Joseph, killing him.

Thiong was the central witness and testified to the following. Thiong had, prior the murder, often supplied Meldish and Petitioner with crack cocaine. The night of the murder, Thiong gave Meldish drugs, which Meldish and Petitioner consumed. Later that night, around 2:00 a.m., Thiong drove the trio to Frenchy's at Meldish's direction. Thiong testified that, once the car was parked nearby Frenchy's, Meldish and Petitioner began to whisper to each other:

We get to Frenchy's and Kim [Petitioner] is taking forever to do what she supposed to do. So we sitting there. Like two, three minutes go by, I'm like, Joey [Meldish], what's going on? And he nudges her like go ahead, go ahead Kim. Do what you gotta do. They start whispering.

4

Trial Tr., ECF No. 14-9, at 348. Eventually, Petitioner exited the car, walked inside Frenchy's, returned minutes later, and told Meldish where a man, a man thought by Petitioner to be Thomas Brown, was sitting.[2]  Meldish then entered Frenchy's to carry out the shooting:

> [Petitioner] comes out and she says that Brown is in there sitting, somewhere sitting on a stool.  She said the exact stool . . . .  Joey then puts the mask on, and the gun.  He gets out, he goes inside.  The shots went off.  I'm ducking in the car because I didn't want anybody to identify me. . . .  I almost pulled off.  I'm getting real nervous. . . .  Kim tells me to wait, and eventually Joey comes out within a minute and he points a gun at me, told me to drive.

*Id.* at 349.  About one week after Joseph Brown's murder, Thiong spoke with Meldish, and Meldish warned him that "he would kill [Thiong] or [his] family if [he] spoke up against the Frenchy's homicide."

Eileen Brown was called by the prosecution to corroborate Thiong's account.[3] She testified to the following.  On the night of the murder, Eileen and Joseph Brown arrived at Frenchy's, which was "very crowded" and noisy, and found a few "bar stools" in the back where it was quieter.  At some point, Eileen Brown went to use the women's restroom, and while there saw a woman in the mirror "who did not look like [she] fit in th[e] bar" and appeared to be "very heavily on drugs."  At trial, Eileen Brown was shown a photograph of Petitioner taken in 2002 and identified the person in the photograph as the woman from "the bathroom in Frenchy's." Around 2:00 a.m. the night of the murder, Eileen Brown heard a "commotion" and saw a man wearing all-black clothing and a ski mask approach.  The man pulled out a gun, said "This is for you, Motherfucker," and started firing at Joseph Brown.  Eileen Brown fled to a restroom for

---

[2] The prosecution introduced several pieces of evidence to show that Thomas Brown and Joseph Brown looked alike.  For example, a photograph of Thomas and Joseph standing next to one another was introduced as an exhibit, and both Thomas Brown and Eileen Brown testified that the brothers were similar in age, height, and appearance.

[3] Under New York law, "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborate evidence tending to connect the defendant with the commission of such offense."  N.Y. C.P.L. § 60.22.

cover; when she returned, she found Joseph Brown shot dead.

## 2. The Defense

The defense focused principally on discrediting Thiong and Eileen Brown. Petitioner's trial counsel cross-examined Brown and Thiong, and introduced the testimony of others present at Frenchy's the night of the murder.

On direct examination, the defense examined Mike Hangan, a bartender working at Frenchy's the night of the shooting, and Jason Fox, a bouncer working at Frenchy's that same night. Hangan testified that the bar was very busy that night and that a man with a mask fired several shots at Joseph Brown. Hangan did not recall seeing Petitioner at Frenchy's that night. Fox testified that the bar was crowded and that he was responsible for collecting entrance fees from patrons. Fox testified that around 2:30 a.m., a man walked by him without paying; that Fox chased after the man into the crowd; and that the man then pulled out a gun and began to fire. Like Hangan, Fox did not recall having seen Petitioner that evening.

On cross examination, defense counsel pressed Eileen Brown on the details of her memory. Eileen Brown confirmed she had not mentioned seeing Petitioner in the restroom until meeting with Detective Tracy, years later. Defense counsel asked Eileen Brown if, on the night of the shooting, she had given "all the names of people" she recognized at Frenchy's, and she responded that she had not, because she "was a nervous wreck." Eileen Brown conceded she could not recall the exact time that she went to the restroom. Defense counsel also drew out on cross that Eileen Brown remembered the shooting as taking place approximately 45 minutes after seeing Petitioner in the restroom, which counsel later contrasted with Thiong's testimony that the shooting had taken place within minutes of Petitioner returning to his car.

Defense's cross-examination of Thiong was extensive, spanning nearly 300 pages of trial transcript. Defense counsel brought out to the jury, *inter alia*, that Thiong was a career

6

drug dealer; that Thiong's Westchester county drug arrest was serious and entailed a substantial potential term of imprisonment; that Thiong had, in the two 1999 interviews, lied to authorities by saying that he did not have knowledge of the Frenchy's murder; and that Thiong had entered into a plea deal (or deals) with the police that resulted in immunity for any conduct relating to the murder and a sentence of time-served for the Westchester drug charges. Thiong made clear that he understood that his testimony against Petitioner obtained for him (a) immunity for the murder of Joseph Brown, and (b) a favorable disposition of the Westchester drug charges:

Q: Now, when you met with Ms. Scaccia, you are telling this Jury that the only deal you got was immunity from prosecution on this homicide, correct?

A: Incorrect.

Q: Is that correct?

A: That's incorrect.

Q: It's incorrect, you got another deal, what other deal did you get?

A: Time served.

. . . .

Q: You got the misdemeanor as part of the deal with Ms. Scaccia and the Westchester County District Attorney's Office?

A: And immunity.

Q: And immunity. So, the misdemeanor was part of the deal, it wasn't just immunity, correct?

A: Correct.

Trial Tr. at 480:18-481:24. The Defense did not question Thiong on the 2007 interview with law enforcement, in which Thiong had said that Meldish had carried out the murder on his own.

In the defense closing, counsel argued to the jury that Detective Tracy seemed to have a "magical" effect on the ability of witnesses to remember details of the murder:

7

It seems that whenever he appeared, all of a sudden, he had this magical effect and everything was put together. Witnesses remembered, the case was made and we move on. He closes the case, which is limited for your consideration, essentially, as far as my client, Kimberly Hanzlik, is concerned, to two people. Trust David Thiong, rely on his testimony. Rely on the memory and accuracy of Eileen Brown. If you have questions that are reasonable then you can't. Then you have to find them not guilty.

Trial Tr., ECF No. 14-13, at 1083. Counsel contended that Thiong's plea deal amounted to a

"purchase of his testimony" against Petitioner:

Was this a purchase of his testimony? Well, nobody paid money for it, but there are other ways to purchase testimony, aren't there? There [are] other ways to purchase things. There is bartering: I give you something, you give me something. In this particular case, instead of facing the . . . felony, many, many years in prison, he's out in eleven months [on time served], and what's the condition for that? Tell us that Joey and Kim did it.

*Id.* at 1070.

### 3. The Verdict and Sentence

On February 16, 2011, the jury convicted Petitioner of second-degree murder.

On March 9, 2011, Petitioner was sentenced to a term of incarceration of twenty years to life. *See* Sentencing Tr., ECF No. 14-15, at 12:3-4. The First Department of the Appellate Division unanimously affirmed the conviction on May 15, 2012, *People v. Hanzlik*, 945 N.Y.S.2d 229 (1st Dep't 2012), and the New York Court of Appeals denied Petitioner's application for leave to appeal on August 20, 2012, *People v. Hanzlik*, 19 N.Y.3d 997 (2012).

### B. Posttrial Proceedings

#### 1. First § 440 Motion

On June 25, 2013, Petitioner, via new counsel, moved pursuant to N.Y. C.P.L.

§ 440.10 to vacate her conviction on the ground that trial counsel, Jonas Gelb, was ineffective. *See* SR 20, 39. Petitioner contended that Gelb's failure to impeach Thiong with the statements made in his third interview with police—reflected in the handwritten notes and DD5 report and

8

which inculpated Meldish but exculpated Petitioner—rendered Gelb ineffective. Gelb claimed

to have never received the DD5 report (although a private investigator hired by Petitioner's new

counsel claimed to have found the DD5 report in Gelb's files, *see* SR 29).

The Bronx County Supreme Court denied Petitioner's motion on February 20

2014, reasoning in part that, whether or not Gelb had been given the DD5 report, Petitioner had

not demonstrated that Gelb's failure to question Thiong was prejudicial:

> [T]here is nothing to suggest that the introduction of the statement or questioning
> of Thiong regarding the statement would have brought about a different result.
>
> . . .
>
> A review of the trial transcript indicates an exhaustive cross-examination by
> counsel of Thiong. Counsel elicited that Thiong had made numerous statements
> both exculpating and inculpating both defendant Hanzlik and co-defendant
> Meldish. Counsel established that Thiong did not make a statement which
> inculpated Hanzlik and Meldish until he was given immunity for his participation
> in the murder. . . . Thus the jury was keenly aware of the inconsistencies and
> discrepancies in the numerous statements made by Thiong.
>
> . . . .
>
> [C]ounsel attempted to discredit Thiong's August 2007 statement to Det. Tracy,
> in which he inculpated both defendants, by introducing two statements made by
> Thiong to other detectives in April and August 1999, in which he exculpated both
> of them; and by attributing the abrupt turn-around in Thiong's statement to
> improper influence or inducement by Det. Tracy. . . . Both counsel argued that
> obviously Det. Tracy had induced Thiong to inculpate the defendants . . . . Thus,
> the strategy was to present Thiong's trial testimony as a manufactured, and hence,
> unbelievable departure from his earlier truthful statements.
>
> . . . .
>
> That position—that there was a complete turnaround in Thiong's account of the
> incident once Det. Tracy got involved—would not have been advanced by a
> report that showed that Thiong's account had incrementally changed . . .

SR 12-15. The First Department unanimously affirmed on April 9, 2015, echoing the lower

court's finding on prejudice:

9

[D]efendant has not satisfied the prejudice prongs of either a state or federal ineffectiveness claim. Defendant has not shown that counsel's failure to use the statement at issue deprived defendant of a fair trial, or that there is a probability sufficient to undermine confidence in the outcome that use of the statement would have led to a more favorable verdict. Under the circumstances, the jury would likely have perceived the statement as merely another inconsistent statement made by the witness long before he entered into a deal with the prosecutors. As the trial actually unfolded, the jury chose to credit the witness's testimony, and discredit the contradictory earlier narrative. It is not likely that introduction of a half-consistent, half-inconsistent statement would have altered the jury's analysis.

*People v. Hanzlik*, 8 N.Y.S.3d 271, 272 (1st Dep't 2015) (quotation marks omitted). The Court

of Appeals denied leave to appeal. *See People v. Hanzlik*, 25 N.Y.3d 1164 (2015).

### 2. Second § 440 Motion

On March 28, 2016, after again retaining new counsel—counsel in this present

action—Petitioner filed a second § 440 motion seeking vacatur of her conviction, raising three

main arguments: (a) Gelb was ineffective; (b) the government withheld evidence in violation of

*Brady v. Maryland*, 373 U.S. 83 (1963); and (c) Petitioner was actually innocent. *See* SR 346.[4]

Petitioner contended principally that whether or not Gelb had been given the DD5 report: Gelb

received the handwritten notes containing the same information; Gelb failed to cross Thiong on

the notes on the erroneous view that the notes could not be introduced as an exhibit; the assistant

ADA who opposed Petitioner's first § 440 motion had, during that round of § 440 proceedings,

procured an affirmation from Gelb confirming that Gelb's failure to cross Thiong on the notes

was due to his incorrect view as to their inadmissibility, not any strategy[5]; and that the ADA had

---

[4] While the Supreme Court has not expressly recognized "actual innocence" as a cognizable standalone habeas claim, *see McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013), such relief is available in New York state habeas proceedings, *see People v. Hamilton*, 979 N.Y.S.2d 97, 108 (2d Dep't 2014).

[5] Gelb's affirmation suggests that he believed he could not question Thiong on the handwritten notes because, in the notes, "the author was unidentified and the document itself was undated." SR 422. This is contrary to New York and Second Circuit law, which provide that counsel need only have a "good faith" basis for posing a question on cross-examination. *See, e.g., People v. Crawford*, 256 A.D.2d 141, 142 (1st Dep't 1998) (citing, *inter alia*, *People v. Schwartzman*, 24 N.Y.2d 241 (1969), *cert. denied* 396 U.S. 846; *United States v.*

failed to submit Gelb's affirmation to the court in violation of *Brady*.

The Bronx County Supreme Court denied Petitioner's motion on August 24, 2016, *see* SR 472, and denied her motion for reargument on December 8, 2016, *see* SR 501. Leave to appeal that decision was denied.

### 3. Federal Habeas Petition

Petitioner filed the instant federal habeas action on August 29, 2017, claiming ineffective assistance of trial counsel, prosecutorial misconduct, and actual innocence. *See* ECF No. 1. The government filed an opposition, *see* ECF Nos. 14, 15, and oral argument was set for June 19, 2018, *see* ECF No. 20. Around six weeks before the scheduled argument, Petitioner submitted a letter notifying the Court that the transcript of Thiong's 2007 plea to Westchester County drug charges had been unsealed. Petitioner alleged that the unsealed minutes showed that, despite the government's trial attorney—Bronx ADA Christine Scaccia—denying at trial that there was any agreement on the part of the Bronx DA's office concerning the disposition of Thiong's Westchester County charges, there was in fact a three-way agreement between Thiong, the Westchester DA's office, and the Bronx DA's office. *See* ECF No. 21, at 1-2. Petitioner pointed to a passage of the minutes in which Westchester county ADA Kevin Kennedy described the meeting that took place between, *inter alia*, his office, the Bronx DA's office, and Thiong, shortly before Thiong's plea:

> Earlier this morning there was a meeting had in the courthouse between the representatives of the Bronx District Attorney's Office as well as . . . the New York Police Department. The understanding between all parties, *which will include the Bronx District Attorney's Office*, is as follows: The defendant is to give full and complete cooperation to the Bronx District Attorney's Office in an ongoing homicide investigation. This shall include but is not necessarily limited

*Concepcion*, 983 F.2d 369, 391 (2d Cir. 1992). The record reflects that Gelb later asked the government lawyer with whom he was communicating to amend this affirmation, which led to Gelb filing a second affirmation that, among other things, no longer included the language indicating that Gelb believed he was not allowed to introduce the notes. *See* SR 429.

to his truthful, full testimony before the Bronx County Grand Jury in the near future. And of course if necessary trial testimony. If his cooperation is completed, we will, based on a representation of the Bronx District Attorney's Office that that was so, allow him to withdraw his previously entered plea to criminal possession of a controlled substance in the fifth degree, have him withdraw that and just proceed to sentence on the possession. . . . It's represented by the Bronx District Attorney's Office that they will request a withdrawal of the charges of the parole violation.

*Id.* at 2 (quoting David Thiong Plea Tr., ECF No. 33-2, at 4-5) (emphasis added by Petitioner).

Petitioner contrasted this description of Thiong's cooperation arrangement with Scaccia stating

at the trial that any deal with Thiong as to his Westchester drug charges was made under the sole

prerogative of the Westchester DA's office:

> The Court: So, the question Ms. Scaccia to you is, whether the deal [between the Bronx DA's office and Thiong] included this . . . time served and a misdemeanor in Westchester or not.
>
> Ms. Scaccia: No, they were bringing him up there to take the deal that day. . . . I went over there and made the deal on the murder. . . .
>
> The Court: . . . Your understanding was with Mr. Thiong did not include any plea to a misdemeanor on a Westchester case?
>
> Ms. Scaccia: That was their deal with him. And, the one thing they did ask me if I had any opposition to it and I said no, he can be sentenced, they can do whatever they want.

Trial Tr. at 494 (cited at ECF No. 1).

The government filed a response letter noting, *inter alia*, that because "the plea

had been taken in Westchester County and had been entered under seal and not unsealed until

recently," the Bronx District Attorney had only obtained it "about a week" before Petitioner filed

her letter notifying the Court of its existence. ECF No. 22, at 1.

On May 18, 2018, I issued an order staying the case to allow Petitioner to pursue

a new claim in state court based upon the newly released plea minutes. *See* May 2018 Order,

ECF No. 23. In the order, I explained that a stay was the proper response to new evidence that

12

had not yet been considered by the state courts:

> [I]n federal habeas proceedings of this kind, I am not permitted to consider materials that have not yet been reviewed by the state court that adjudicated petitioner's claim. As the Supreme Court explained in *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." . . . . I am bound by this precedent.

*Id.* at 6-7. I noted that while the plea minutes provided Petitioner with a "colorable" claim, she would still "ultimately have to demonstrate that, taken cumulatively with the remainder of the evidence, there is a *reasonable probability that the result of her case would have been different.*" *Id.* at 7-8 (emphasis added) (quotation marks omitted). I instructed Petitioner to promptly file a new claim in state court and cautioned that, for the time being, this "Court expresse[d] no views on the merits of the underlying petition as it was originally presented." *Id.* at 2 n.1.

### 4. Third § 440 Motion

Petitioner filed her third § 440 motion in June, 2018, citing the unsealed plea minutes as evidence that Thiong, ADA Scaccia (on behalf of the Bronx DA's office), and the Westchester DA's office, entered into a "global resolution of *all* of Thiong's pending matters[,] which included his case in Westchester." Cohen Aff. in Support of § 440 Motion, ECF No. 33-1, at ¶ 16. The government opposed, citing a sworn statement from Scaccia that she had never asked the Westchester County DA's office to take a particular action on Thiong's Westchester charges, that her offer of immunity on the murder was independent, and that she never saw the plea transcript and was thus unaware of comments made therein implying that the Bronx DA's office was part of any three-way deal. *See* Gov't Opp. Mem., ECF No. 36-2, at 33-34.

The Bronx County Supreme Court scheduled a hearing on Petitioner's motion. *See* Nov. 16 2018 Order Granting Hearing, ECF No. 33-3. The court limited the hearing to, *inter alia*, questions regarding the extent to which (1) "the Bronx District Attorney's office was

13

involved in any offers . . . in related proceedings," and (2) "any facts not disclosed or belatedly disclosed affected the ability of the defense to challenge the witness's credibility at trial." *Id.* at 2. The hearing was held over three days spanning from late January to mid-February 2019. *See* Hearing Tr., ECF No. 33-4.

### *i. Petitioner's case*

Petitioner opened by calling her trial counsel, Jonas Gelb. Gelb testified that at the time of trial, he was aware that Thiong had been given immunity for the murder and that Thiong was simultaneously facing drug charges in Westchester. *Id.* at 7:12-21. Gelb testified that Scaccia had informed him that "the only promise or the only thing she was part of or knew about was the murder case . . . in the Bronx, but she was not part of any sentence that he received in Westchester." *Id.* at 7:23-8:1. Gelb recalled that Thiong "was cross examined extensively about the fact that he received such a light sentence and such an ultimate deal based upon his record and the charges against him in Westchester." *Id.* at 8:2-4.

Gelb affirmed that Scaccia indicated to him that "she had no involvement in . . . the disposition of the Westchester County case," *id.* at 9:7-10, and that if Gelb had known of any joint cooperation agreement between Thiong and both DA's offices, he would have "used that information" to "ask[] more questions," *id.* at 10:25-11:5, 13:12. However, Gelb conceded he had "questioned Mr. Thiong quite vigorously regarding the disposition of that Westchester case, which seemed like the greatest sweetheart deal," *id.* at 11:10-12, and, when asked on cross, Gelb was unable to provide examples of additional questions he would have asked on the minutes:

> Q: So what else would you have asked him that you didn't have the ability to ask him, but you didn't know about a deal?
>
> A: Well, I think if I had had, and I believe they were sealed at the time, so we weren't able to get his plea minutes out of Westchester, that's my recollection, and if that's the case, I would have gone into that plea and seen what it said.

14

. . . .

Q: Okay. I'm going to ask again, sir, what questions would you have asked that you did not have the ability to ask[?]

A: . . . [I]f I had the actual deal exactly what it said, and what promises were made, I think I would have gone into more detail about it. . . . well, you're asking me what I would have said, so I'm telling you. . . . Now, if you're asking me what I would have asked, it depends on what would have been revealed as to the exact details of the promise.

*Id.* at 17:11-18:19.

Next, ADA Scaccia was called to testify. Scaccia testified that at the time she met Thiong, he was already in custody in Westchester, and that Scaccia needed to communicate with the Westchester DA's office in order to set up a meeting with Thiong. *See id.* at 36:17-23. Scaccia recalled speaking with the Westchester DA's office to schedule a meeting with Thiong, but did not recall details from these conversations. *See id.* at 37:9-20. Scaccia testified that on the day that Thiong was set to appear in Westchester court, Scaccia met with Thiong, Thiong's attorney, Westchester ADA Patrick Moore, and Bronx Detective Tracy, at which time Thiong was given a "queen for a day" deal to speak freely about the events surrounding the murder. Scaccia testified that she decided during this meeting that she would like to call Thiong as a witness in the murder trial; that she left the meeting before Thiong's plea; and that she did not attend Thiong's plea. *See id.* at 46-49.

Scaccia testified repeatedly that there was no agreement on her part that Thiong was to receive a benefit from the Westchester DA's office on his drug charges. *See, e.g., id.* at 62:21-22 ("Whatever Westchester County did with Mr. Thiong was Westchester County's deal with Mr. Thiong."); 67:14-17 ("Q: Did . . . Mr. Thiong, during cross examination, state that in addition to immunity, he had received time served on the drug charge, do you recall that? A: That was his Westchester deal . . ."); 79:23 ("I was not involved in that at all."); 82:5-7 ("Q: And

15

as far as you were concerned, whatever Westchester wanted to do was up to them? A: Yes."). Scaccia affirmed that she was not aware that reference was made at Thiong's Westchester plea hearing to his promised testimony in the homicide trial. *See id.* at 87:4-15. Finally, Scaccia testified that, prior to Thiong's plea, she received a call from a Westchester ADA asking whether it would interfere with Scaccia's prosecution of the homicide if the ADA were to offer Thiong some kind of a deal on the Westchester drug charges. Scaccia believed this inquiry was made as a "professional courtesy." *See id.* at 94:11; *id.* at 101:3-5 ("[H]e knows he has a defendant I'm interested in using as a witness, so he reached out and was asking if I had any objection to it going forward.").

Next, Murray Richman, the attorney who represented Meldish at trial was called. Richman testified that, at the time of the trial, Scaccia advised the defense that she had gone to see Thiong in Westchester County, but that "there was no deal" between her and Thiong as to the Westchester drug charges. *See id.* at 118:11-15.

### ii. The Government's case

The government's only witness was Patrick Moore, who was chief of the gang violence and firearms bureau in the Westchester DA's office at the time of Thiong's plea. *See id.* at 131:1-18. Moore testified that he was present at the August 16, 2007 meeting with Thiong and that he did not recall any discussion with Scaccia at that meeting regarding a disposition of the Westchester drug charges. *See id.* at 133:15-17. Moore was asked to review Thiong's case file from Westchester, and testified that the file indicated that there were "issues" with the case against Thiong that were recorded before any contact with Scaccia, *e.g.*, a confidential informant upon which the government would need to rely for prosecution of Thiong's drug charges was not willing to cooperate. *See id.* at 134:1-24. Moore testified that in such circumstances, it would not be unusual to offer the defendant a plea to a lesser charge. *See id.* at 136. Moore testified

16

that he was not aware of Scaccia asking him or anyone in the Westchester DA's office "to do anything for [Thiong] on the Westchester case." *Id.* at 136:20-22. Moore was not present at Thiong's actual plea hearing. *See id.* at 143:5-9.

On cross, Moore was shown notes from the case files of the Westchester DA's office. One of the notes, made by Kevin Kennedy, the Westchester ADA who was present at Thiong's plea, said "CI [confidential informant] to provide information regarding a homicide that took place several years ago in Bronx allegedly by the target in exchange for a reduced plea and sentence on Westchester drug possession case." *Id.* at 142:5-8. Moore testified that Kennedy was the ADA present at Thiong's plea hearing. *See id.* at 143:8-11.

### iii. Ruling

On April 8, 2019, the Bronx County Supreme Court denied Petitioner's motion. The court commented that it was "unsettling" that Scaccia had "attempt[ed] to insinuate during her summation that she indeed could have offered the defendant something in his Westchester case in exchange for his testimony, while simultaneously denying the existence of any influence over the Westchester outcome," and that it was "farfetched" that Scaccia did not recall the details of her conversation with the Westchester ADA aside from arranging a meeting with Thiong. April 8, 2019 Decision, ECF No. 33-6, at 14-15. Nonetheless, the court reasoned that while Thiong's favorable plea in Westchester county might "suggest a potential violation of *Brady*" if in fact the prosecution failed to disclose a three-way agreement between the Westchester DA, Bronx DA, and Thiong, other possibilities were just as likely:

[It is] also conceivable that the two offices had separate agendas, or that the Westchester DA just chose to accommodate Bronx without it being a deal. . . . The only aspects of the situation which have now surfaced are the Westchester ADA's running notes and the August 16, 2007 [sealed plea] transcript, which reveals the ADA's characterization of the plea to the Westchester judge. ADA Scaccia repeatedly affirmed that she was not present at the plea or sentencing of Thiong during the trial, in her affirmation and at the 440 hearing. She could not

17

have known what the Westchester prosecutor actually said to the court.

. . . .

It was not incumbent on the Bronx Assistant District Attorney to explain how
notes that could imply a three way deal were in the Westchester ADA's file unless
of course she knew. The defendants did not call ADA Kennedy. Neither did
defendants call Thiong's attorneys as to the negotiations that ensued after ADA
Scaccia left the Westchester courthouse. A hearing court is left to conjecture
whether the Westchester DA's office acted independently because of issues in
their case, or as a courtesy to the Bronx DA, or for other reasons.

*Id.* at 11, 14. The court also noted that Petitioner's counsel had "vigorously" attacked Thiong's

credibility at trial due to his deal with the Bronx DA's office and his favorable Westchester plea,

and that further exploration of a three-way deal would not have changed the picture for the jury:

[T]he defense had a full opportunity to cross examine the witness at trial and did
so vigorously. Both defense attorneys during their cross examinations asked
Thiong if his understanding of his cooperation deal included a plea to a
misdemeanor on his Westchester narcotics case and time served plus ninety days
on his violation of parole. Thiong agreed that he received other benefits beyond
immunity. Thiong may have believed based upon the timing of the plea and a
conjoined meeting with both District Attorney's offices that his cooperation
agreement included immunity as well as the Westchester plea as evidenced by his
testimony during the trial. But both defense counsel amply cross examined
Thiong's credibility based upon Thiong's understanding of the various parameters
of the cooperation agreement. In their summations, both counsel attacked
Thiong's credibility based upon his plea deal. The jury was able to consider each
of these issues in conjunction with Thiong's credibility and, nonetheless, found
each of the defendants guilty.

*Id.* at 12-13 (quotation marks omitted).

### *iv. Postruling procedural history*

The Appellate Division's First Department denied leave Petitioner leave to appeal

on July 23, 2019. *See People v. Hanzlik*, 2019 WL 3294947, 2019 N.Y. Slip Op. 75876(U) (1st

Dep't, July 23, 2019). That October, Petitioner notified the Court of the First Department's

ruling, and I lifted the stay and ordered supplemental briefing. *See* ECF Nos. 24, 29.

Petitioner's federal habeas petition raises three challenges to her conviction: (1) prosecutorial misconduct; (2) ineffective assistance of counsel; and (3) actual innocence. None of these claims warrants disturbance of her conviction, for the reasons that follow.

A writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The most recent state court ruling clearly adjudicated Petitioner's claim of prosecutorial misconduct on the merits, but did not address Petitioner's claims of ineffective assistance and actual innocence. Although the two earlier rounds of state court decisions denying Petitioner's § 440 motions expressly rejected her ineffective assistance and actual innocence claims, for the avoidance of doubt I assume that the most recent decision is operative for purposes of review, and review these claims *de novo*.[6]

I begin by rejecting Petitioner's freestanding claim of actual innocence. As the Second Circuit recently explained: "Actual innocence is not itself a constitutional claim—except

---

[6] The Supreme Court recently held that, in § 2254 petitions, federal courts are to "'look through' the state appellate courts' 'unexplained decision[s]' to the last related state-court decision that *does* provide a relevant rationale.'" *Scrimo v. Lee*, 935 F.3d 103, 111 (2d Cir. 2019) (quoting *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)). Here, however, Petitioner—who does not specifically address the correct standard of review in her most recent round of briefing—seems to suggest that the unsealed plea minutes changed the complexion of her ineffective assistance claim vis-à-vis the evidence as presented in her earlier § 440 petitions, *see, e.g.*, Reply Mem. in Support of § 2254 Pet., ECF No. 39, at 2, making it perhaps arguable that less deference should be applied than that commanded by AEDPA. *Cf. Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts . . . never reached the issue . . . we examine this element of the *Strickland* claim *de novo*."). The Court need not resolve this question because, for the reasons stated above-the-line, even under *de novo* review, Petitioner's ineffective assistance claim fails.

perhaps when raised in the context of an Eighth Amendment challenge to a capital sentence."
*Hyman v. Brown*, 927 F.3d 639, 656 n.20 (2d Cir. 2019) (quotation marks omitted). An actual
innocence claim, "[e]ven if successful, . . . cannot itself afford [Petitioner] habeas relief from [a]
state conviction," and instead is only capable of—in extraordinary circumstances—"open[ing] a
gateway to federal review of an otherwise procedurally barred" constitutional claim. *Id.* at 655.
Here, Petitioner's claim is not procedurally defaulted,[7] because it was made within one year of a
"factual predicate" of her claims, *i.e.*, the unsealed plea minutes, and thus the actual innocence
gateway is irrelevant. *See* 28 U.S.C. § 2244(d)(1)(D).

        Despite the convolution of the factual and procedural history of Petitioner's
claims of ineffective assistance and prosecutorial misconduct, the legal resolution of these claims
is straightforward: These claims must be rejected for the simple fact that she was not prejudiced
by any of the trial deficiencies she alleges. To succeed on a claim of ineffective assistance or
prosecutorial misconduct, a claimant must show that she was prejudiced. *See Strickland v.
Washington*, 466 U.S. 668, 687 (1984) (one must show that (1) "counsel's performance was
deficient," and (2) "the deficient performance prejudiced the defense"); *Strickler v. Greene*, 527
U.S. 263, 281-82 (1999) (to make out a claim under *Brady*, "[t]he evidence at issue must be
favorable to the accused"; that "evidence must have been suppressed"; and "prejudiced must
have ensued"). To establish prejudice under *Strickland*, the petitioner must show "that there is a
reasonable probability that, but for counsel's unprofessional errors, the proceeding would have
been different." 466 U.S. at 694. As to prejudice under *Brady*, we ask if the evidence was
"material," that is, we ask whether "there is a reasonable probability that, had the evidence been

---

[7] The government argues that Petitioner's claims are untimely. *See* Gov't Opp. Br., ECF No. 15, at 29, Gov't
Supp. Opp. Br., ECF No. 37, at 3. But while the government focuses its efforts on contesting Petitioner's
ability to make a showing of actual innocence, the government ignores the statutory basis for filing a petition
after new evidence is discovered, *see* 28 U.S.C. § 2254(d)(1)(D), and the resultant significance of the plea
minutes being unsealed in the spring of 2018.

20

disclosed to the defense, the result of the proceeding would have been different." *United States v. Orena*, 145 F.3d 551, 557 (2d Cir. 1998) (quotation marks omitted). "It is well settled that where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." *Id.* at 559; *see also United States v. Avellino*, 135 F.3d 249, 257 (2d Cir. 1998); *United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003) ("A new trial is generally not required . . . when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.") (quotation marks omitted).

           The evidence Petitioner claims was either (a) not properly examined by trial counsel or (b) shrouded by the prosecution, would have been entirely duplicative of evidence and arguments already put in front of the jury. Petitioner claims that trial counsel was ineffective for failing to cross Thiong on his third interview with the police, in which he inculpated Meldish but exculpated Petitioner. But as detailed *supra*, trial counsel cross-examined Thiong thoroughly, in the process making it clear to the jury both that Thiong has partaken in an abundance of criminal conduct, and that Thiong had twice falsely told the police that he knew nothing about the murder. Trial counsel also ably drew the jury's attention to a number of weaknesses in the government's case, ranging from Eileen Brown's delayed identification of Petitioner, to discrepancies as to the exact timing of the shooting, to the testimony of Frenchy's employees having not seen Petitioner on the night of the murder, to the absence of physical evidence. As the New York state court decisions observed, questioning on Thiong's third interview would have been repetitive of the evidence showing that Thiong had given multiple precursor accounts of the murder that did not comport with his final story, and may also have undercut the theory that Thiong constructed a narrative wholly under the influence of Detective Tracy. It was not error to reject a *Strickland* claim based upon these facts.

As for the *Brady* allegations, Petitioner claims that the prosecution concealed evidence either (a) having to do with Thiong's third interview with police, or (b) Thiong's plea deal on the Westchester drug charges.[8] To start, I note that, as the state court observed, two individuals present at the meeting between the Bronx DA's office, Westchester DA's office, and Thiong, testified that the Bronx DA's office was not involved in resolving Thiong's Westchester drug charges. What's more, Petitioner did not call as a witness ADA Kennedy, the ADA whose comments at Thiong's plea suggested a possible three-way deal and, as a result, predicated the stay imposed by this Court. Nor did Petitioner introduce testimony from Thiong's counsel or other parties present at the August 16, 2007 meeting. This, the state court reasoned, precluded a finding that there was a three-way deal to be concealed. These facts alone support rejection of the *Brady* claim concerning an alleged arrangement with the Westchester and Bronx DA's offices. *See* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue by a State court shall be presumed to be correct. The applicant shall have the

---

[8] Petitioner also seems to attempt a *Brady* claim based on the failure to disclose Gelb's affirmation, in which Gelb stated that he believed he could not introduce the handwritten notes documenting Thiong's third interview with law enforcement at trial. This argument essentially duplicates the claim that it was prejudicial for Petitioner to conceal evidence of Thiong's interview with the police. For the same reasons, as explained above-the-line, that withholding of information on Thiong's third interview with police was immaterial, so too was Gelb's view as to admissibility of such information immaterial. I also note that, while this issue is not addressed by Petitioner, the Supreme Court has declined to extend *Brady* to postconviction state proceedings—the government's alleged failure to disclose Gelb's affirmation took place in the context of Petitioner's postconviction § 440 motions. *See District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009).

Finally, Petitioner makes a secondary *Brady* claim that the prosecution "failed to correct" Thiong's testimony that "he did not know if he ever spoke again to law enforcement" after his second interview, Pet. Supp. Mem., ECF No. 33, at 7, but this claim is internally contradictory and contrary to the trial transcript, as it is clear that Thiong simply was unclear on the timing of any further discussions with law enforcement. *See* Trial Tr. at 488-89. This did not give rise to an duty on the part of the prosecutor to intervene. And in any case, because this testimony concerned Thiong's much-discussed (in this order) third interview, even if the testimony were false it would "not rise to the level of a [Constitutional] violation" because there was not a "reasonable likelihood that the testimony affected the judgment of the jury" or "the outcome of the trial." *Mills v. Scully*, 826 F.3d 1192, 1195 (2d Cir. 1987).

22

burden of rebutting the presumption of correctness by clear and convincing evidence.").

But assuming *arguendo* that this evidence was so concealed, such concealment was not prejudicial. For one, evidence of Thiong's third interview would not have meaningfully changed the mix of evidence presented to the jury for the reasons already discussed. And as to the Westchester drug deal, here too the jury already had the full argument that Petitioner claims she was deprived of making. Trial counsel's cross underscored the seriousness of the charges against Thiong and made clear that Thiong had been guaranteed immunity on the murder charge. Not only that: Thiong testified that he understood his plea deals with the Bronx and Westchester DA's offices to provide not just for immunity on the murder, but for a plea of time served on his drug offenses. Whether this deal did or did not involve the Bronx DA's office, the jury was made aware that Thiong gave his testimony with an expectation of favorable treatment on the Westchester drug charges. Indeed, trial counsel referred to the favorable Westchester result in a long closing statement that argued first and foremost that Thiong's testimony was "purchased." In short, the "main thrust [the] defense" was to challenge Thiong's credibility, but the "jury was unimpressed." *Jackson*, 345 F.3d at 75. To reject the *Brady* claim was to reasonably apply federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d).

To summarize: Even if counsel's performance fell below an objective standard of reasonableness, and even if the details of a three-way deal and Thiong's third interview with the police were improperly withheld by the prosecution, counsel's performance was not prejudicial and the withheld information was not material. The habeas petition must therefore be denied.

### Conclusion

For the reasons stated herein, the petition is denied. As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); *Matthews v. United States*, 682 F.3d 180, 185 (2d Cir. 2012).

23

The Clerk is directed to terminate the motion (ECF No. 33) and close this case.

SO ORDERED.

Dated:     New York, New York
           February 12 2020

ALVIN K. HELLERSTEIN, U.S.D.J.